PHIL GOLDSMITH (OSB No. 78223)
NANINA TAKLA (OSB No. 09525)
LAW OFFICE OF PHIL GOLDSMITH
1618 SW First Avenue, Suite 350
Portland, Oregon 97201
Telephone: (503) 224-2301
Facsimile: (503) 222-7288
phil@lopglaw.com

FILED'10 SEP 8 14:31USDC-ORP

STEVE W. BERMAN
ARI Y. BROWN
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
(206) 623-7292
steve@hbsslaw.com
ari@hbsslaw.com
(to be admitted pro haec vice)

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| JAMES LANGEN, on behalf of himself and all others similarly situated,<br><br>                        Plaintiff,<br><br>   v.<br><br>BANK OF AMERICA, N.A. and BAC HOME LOANS SERVICING, LP,<br><br>                    Defendants. | No. **CV'10-1067 NO**<br><br>**CLASS ACTION ALLEGATION COMPLAINT FOR DAMAGES, RESTITUTION, AND INJUNCTIVE RELIEF – Breach of Contract, Promissory Estoppel, Unlawful Trade Practices Act**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

#35690

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................1

II.     JURISDICTION ....................................................................................................5

III.    PARTIES ...............................................................................................................5

IV.     FACTUAL BACKGROUND .................................................................................6

      A.   The Foreclosure Crisis .................................................................................6

      B.   Creation of the Home Affordable Modification Program.............................6

      C.   Duties of a Participating Servicer Under HAMP...........................................8

      D.   Plaintiff's Effort to Obtain a Loan Modification Under HAMP.................14

      E.   Class Allegations .......................................................................................18

COUNT I:  BREACH OF CONTRACT / BREACH OF DUTY OF GOOD
      FAITH AND FAIR DEALING ..........................................................................21

COUNT II:  PROMISSORY ESTOPPEL, IN THE ALTERNATIVE ............................22

COUNT III:  VIOLATION OF OREGON UNLAWFUL TRADE PRACTICES ACT. .................23

      PRAYER FOR RELIEF ....................................................................................24

## I.   INTRODUCTION

1.      In October 2008, Bank of America accepted $15 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211. In January 2009, in connection with its acquisition of Merrill Lynch, Bank of America accepted another $10 billion in TARP funds along with a partial guarantee against losses on $118 billion in mortgage-related assets.  By accepting these payments, Bank of America agreed that it would participate in one or more programs that TARP authorized the Secretary of the Treasury to establish to minimize foreclosures.

2.      Consistent with the TARP mandate, the Treasury Department implemented the Home Affordable Modification Program ("HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.  Companies that accepted money under the TARP are required to participate in HAMP as are certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac").

3.      Bank of America signed a contract with the U.S. Treasury on April 17, 2009 agreeing to comply with the HAMP requirements and to perform loan modification and other foreclosure prevention services described in the HAMP program guidelines.  The guidelines issued by the Treasury Department set forth a detailed process whereby a participating servicer such as Bank of America, acting through its subsidiary BAC Home Loans Servicing, LP, must:

- identify loans that are subject to modification under the HAMP program, both through its own review and in response to requests for modification from individual homeowners;

- collect financial and other personal information from homeowners to evaluate whether a particular homeowner is eligible for a loan modification under HAMP;

- for borrowers who are eligible for a modification, institute a modified loan

with a reduced payment amount as per a mandated formula effective for a
three-month trial period; and

- provide a permanently modified loan to those homeowners who comply with
  the requirements during the trial period.

Whether the homeowner qualifies for a modification or not, participating servicers are also
required to provide written notices to every mortgage borrower who has been evaluated for a
loan modification, whether or not the borrower has been found eligible.

4.      HAMP and its associated directives also prohibit certain conduct including
demanding upfront payments in order to be evaluated for a loan modification and instituting or
continuing foreclosures while a borrower is being evaluated for a loan modification, as well as
restricting the way a servicer may report the borrower to credit reporting agencies.

5.      Although Bank of America accepted $25 billion in TARP funds and entered into a
contract obligating itself to comply with the HAMP directives and to extend loan modifications
for the benefit of distressed homeowners, Bank of America has systematically failed to comply
with the terms of the HAMP directives and has regularly and repeatedly violated several of their
prohibitions.

6.      Under HAMP, the federal government incentivizes participating servicers to make
adjustments to existing mortgage obligations in order to make the monthly payments more
affordable.  Servicers receive $1,000.00 for each HAMP modification.  However, a number of
financial factors make it more profitable for a mortgage servicer such as Bank of America to
avoid modification and to continue to keep a mortgage in a state of default or distress and to push
loans toward foreclosure.  This is especially true when the mortgage is owned by a third-party
investor and is merely serviced by a servicer.  On information and belief, Bank of America does
not own most of the loans on which it functions as a servicer.

7.      Economic factors that discourage Bank of America from meeting its contractual

obligations under HAMP to facilitate loan modifications include the following:[1]

- The investor may require Bank of America to repurchase a loan which is being permanently modified. This substantial cost and loss of revenue can be avoided by keeping the loan in a state of temporary modification or lingering default.

- The monthly service fee that Bank of America, as the servicer, collects as to each loan it services in a pool of loans is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool. Consequently, modifying a loan by reducing its principal balance results in a lower monthly fee to the servicer.

- Fees that Bank of America charges borrowers in default constitute a significant source of revenue. Additionally, late fees and "process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans, which in turn increases the amount of the servicer's monthly service fee.

- Entering into a permanent modification will often delay a servicer's ability to recover moneys which it is required to advance to investors in an amount equal to the unpaid principal and interest payments on a non-performing loan. The servicer's right to recover expenses from an investor in a loan modification, rather than a foreclosure, is often less clear and less generous.

- Successfully performing loan modifications requires the servicer to invest in additional staffing and physical infrastructure, and to incur expenses for such things as property valuations, credit reports and financing costs.

8.     Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, Bank of America

---

[1]     See Thompson, Diane E., *Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior*, National Consumer Law Center (October 2009).

has serially strung out, delayed, and otherwise hindered the modification processes that it contractually undertook to facilitate when it accepted billions of dollars from the United States. Bank of America's delay and obstruction tactics have taken various forms with the common result that homeowners with loans serviced by Bank of America, who are eligible for permanent loan modifications and who have met the requirements for participation in the HAMP program, have not received the permanent loan modifications to which they are entitled.

9.      According to at least one former Bank of America employee, Bank of America exhibits a general attitude that it does not need to comply with HAMP and that the HAMP obligations will never be enforced against it.

10.     In addition to its obligations based on its contract with the Treasury Department, Bank of America has entered into written agreements with individual homeowners, including Plaintiff, for temporary loan modifications that, upon successful completion, must be converted to permanent loan modifications.  Plaintiff and a class of similarly-situated borrowers have complied with these agreements by submitting the documentation asked of them and by making payments.  Despite their performance, Defendants have ignored their contractual obligations to modify these loans permanently.

11.     Because Bank of America is not meeting its contractual obligations, thousands of Oregon homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes.  By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury and the terms of the contracts it formed with individual homeowners, Bank of America has left thousands of borrowers in a state of limbo – often worse off than they were before they sought a modification from Bank of America.  Defendants' actions violate their contractual obligations, thwart the purpose of HAMP, and are contrary to Oregon law.

12.     Plaintiff James Langen brings this suit on behalf of himself and a class of similarly situated Oregonians ("Plaintiffs") to challenge the failure of Defendant Bank of America, N.A. and its subsidiary BAC Home Loans Servicing, LP (collectively referred to as

"Defendants" or "Bank of America") to honor the terms of their agreement with the United States Treasury for the intended benefit of homeowners, their failure to honor agreements directly with him and other individual homeowners to modify mortgages to a point that they are affordable and sustainable, and to recover costs and losses incurred as a result.

## II.   JURISDICTION

13.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) in that the matter is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and the named plaintiff and members of the Class are citizens of a State different from the Defendants.

14.     This Court also has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367 in that the Plaintiffs are intended, third-party beneficiaries to a contract between Bank of America and the U.S. Treasury that was entered into pursuant to and under the direction of TARP.  12 U.S.C. § 5201 *et seq.*

15.     This Court has personal jurisdiction over the parties in this action by the fact that Defendants are corporations that are licensed to do business in the state of Oregon or otherwise conduct business in the state of Oregon.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and LR 3-2(b) given that a substantial part of the events or omissions giving rise to the claim occurred in the Portland Division, Defendants regularly conduct business in the Portland Division, and the named Plaintiff resides in Multnomah County.

## III.   PARTIES

17.     Plaintiff James Langen is a married man living in Multnomah County, Oregon.

18.     Defendant Bank of America, N.A. is a mortgage lender headquartered in Charlotte, North Carolina.  Defendant BAC Home Loans Servicing, LP is an operating subsidiary of Bank of America, N.A., and is located in Calabasas, CA.  Defendants are collectively referred to as "Bank of America." They are currently, and at all material times have been, doing business in and maintaining branch offices throughout the State of Oregon.

## IV.    FACTUAL BACKGROUND

### A.    The Foreclosure Crisis

19.    Over the last three years, the United States has been in a foreclosure crisis.  A
congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in
foreclosure or default.[2]

20.    Oregon has become one of the states hardest hit by the foreclosure crisis.  Oregon
had the third highest percentage of homes in foreclosure in the United States in the first quarter
of 2010.  The Federal Reserve Bank of New York estimates that at least 22,653 Oregon
homeowners were either in foreclosure or at least 90 days late in January, 2010.  This represents
a 20% increase over the prior quarter.[3]  Another source found Oregon foreclosure filings in 2009
to have increased 89.55% from 2008 and 303.27% from 2007.[4]

21.    Economists predict that interest rate resets on the riskiest of lending products will
not reach their zenith until sometime in 2011.  *See* Eric Tymoigne, *Securitization, Deregulation,
Economic Stability, and Financial Crisis*, Working Paper No. 573.2 at 9, Figure 30, available at
http://papers.ssrn.com/so13/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study
showing monthly mortgage rate resets).

### B.    Creation of the Home Affordable Modification Program

22.    Congress passed the Emergency Economic Stabilization Act of 2008 on
October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on
February 17, 2009 (together, the "Act").  12 U.S.C.A § 5201 *et seq.* (2009).

23.    The purpose of the Act is to grant the Secretary of the Treasury the authority to
restore liquidity and stability to the financial system, and to ensure that such authority is used in
a manner that "protects home values" and "preserves homeownership."  *Id.*

---

[2]    Congressional Oversight Panel, Oct. 9, 2009 report at 3.  Available at
http://cop.senate.gov/reports/library/report100909-cop.cfin.

[3] http://www.oregonlive.com/business/index.ssf/2010/07/oregon_forclosure_rate_falls_2.html.

[4]    http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&itemid=8333.

24.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program (TARP) to purchase or make commitments to purchase troubled assets from financial institutions.  12 U.S.C. § 5211.

25.     Congress allocated up to $700 billion to the United States Department of the Treasury for TARP.  12 U.S.C. § 5225.

26.     The Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities" in exercising authority to administer TARP.  12 U.S.C. § 5213(3).

27.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and shall use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures."  *Id.*

28.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures.  12 U.S.C. § 5220.

29.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

30.     The Making Home Affordable program consists of two subprograms.  The first relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program or HARP.

31.     The second subprogram relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program or HAMP.  It is this subprogram that is at issue in this case.

32.     HAMP is funded by the federal government, primarily with TARP funds.  The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is

TARP money.

## C.    Duties of a Participating Servicer Under HAMP

33.     Because Bank of America accepted $25 billion in federal funds as well as
additional loan guarantees, it is required to participate in HAMP for the loans on which it
functions as a loan servicer.  On April 17, 2009, Steve R. Bailey of Bank of America, N.A.
executed a Servicer Participation Agreement ("SPA") with the federal government.  A copy of
this SPA is attached as Ex. 1.

34.     The SPA executed by Mr. Bailey incorporates all "guidelines," "procedures," and
"supplemental documentation, instructions, bulletins, frequently asked questions, letters,
directives, or other communications," referred to as "Supplemental Directives," issued by the
Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers.
These documents together are known as the "Program Documentation" (SPA I.A.), and are
incorporated by reference herein.  The SPA mandates that a Participating Servicer "shall
perform" the activities described in the Program Documentation "for all mortgage loans it
services."  SPA I.A., 2.A.[5]

35.     The first Supplemental Directive ("SD") was issued on April 6, 2009, and states
that the national mortgage modification program is "aimed at helping 3 to 4 million at-risk
homeowners – both those who are in default and those who are at imminent risk of default – by
reducing monthly payments to sustainable levels."  Ex. 2 at p. 1.  This and subsequent directives
were issued to provide guidance for adoption and implementation of HAMP "to provide a
borrower with sustainable monthly payments."  *Id.*

36.     The Program Documentation requires Participating Servicers to evaluate *all loans*
which are 60 or more days delinquent or appear to be in imminent default (as defined by the

---

[5]     The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01,"
attached hereto as Exhibit 2), Home Affordable Modification Program; Base Net Present Value
(NPV) Model Specifications ("NPV Overview," attached hereto as Exhibit 3) and Supplemental
Documentation-Frequently Asked Questions ("HAMP FAQS," attached hereto as Exhibit 4) and
Supplemental Directive 09-08 ("SD 09-08," attached hereto as Exhibit 5).  These documents
together describe the basic activities required under HAMP and are incorporated by reference in
the TPP Agreement signed by Plaintiff.

Program Documentation), to determine which loans meet the HAMP eligibility criteria. *Id.* at p. 4. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for a HAMP modification. *Id.* at pp. 3-4.

37.     A HAMP modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP"). Second, upon successful completion of the TPP, the Servicer must offer the homeowner a permanent modification.[6]

38.     A mortgage is eligible for the HAMP if criteria enumerated in the Program Documentation are met. The loan must be a first lien mortgage originated before 2009 and the property must be the borrower's principal residence. The other most salient conditions are that the loan is delinquent or default is reasonably foreseeable; that the borrower documents a financial hardship (as defined in the Program Documentation); and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income. *Id.* at p. 2.

39.     The servicer must "provide a borrower with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions." *Id.* at p. 13.

40.     Once the participating servicer has determined a mortgage borrower is eligible for the HAMP, the servicer must apply the modification steps enumerated in the Program Documentation, in the stated order of succession, until the borrower's monthly mortgage payment ratio is reduced to 31 percent of the borrower's monthly income. These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term and re-amortizing the loan (if necessary), and providing a principal forbearance (if necessary).

---

[6]     The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in Exhibit 2. Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan to reduce the monthly mortgage payment to 31% of their monthly income for the next five years.

*See* Ex. 2 at pp. 8-10; *see also* Ex. 3 at p. 2.

41.     After applying the enumerated modification steps to calculate the modified
payment amount, a servicer must offer an eligible borrower a TPP.  The TPP consists of a three-
month period in which the homeowner makes mortgage payments based on the modification
formula stated in the Program Documentation.  Bank of America uses a standard form agreement
to offer TPPs to eligible homeowners.  This agreement describes the homeowner's duties and
obligations under the plan and promises a permanent HAMP modification for those homeowners
who execute the agreement and fulfill the documentation and payment requirements.

42.     If the homeowner executes the TPP Agreement, complies with all documentation
requirements and makes all three TPP monthly payments, the second stage of the HAMP process
is triggered, in which the homeowner must be offered a permanent modification.  The payment
amount and interest rate in the modified loan are fixed for five years and equal to the payment
amount and interest rate in the TPP.  Thereafter, the interest rate may increase annually by up to
one percent until it reaches an interest cap which is the lesser of:  (i) the fully indexed and fully
amortizing contract rate or (ii) the Freddie Mac Primary Mortgage Market Survey rate for 30-
year fixed rate mortgage loans on the date the modification is prepared.  Once capped, the rate is
fixed for the remainder of the term.  *See* Ex. 2 at p. 9.

43.     Subject to minor adjustments that can be made to account for documented and
verified changes in income, HAMP directs that the terms of the TPP, upon its successful
completion by a homeowner, automatically be made permanent. SD 09-01 states that "[i]f the
borrower complies with the terms and conditions of the Trial Period Plan, the loan modification
will become effective on the first day of the month following the trial period as specified in the
Trial Period Plan." Ex. 2 at p. 18.

44.     HAMP prohibits a participating servicer from taking certain actions including the
following:

- Proceeding with a foreclosure sale.  Any foreclosure sale must be suspended and

no new foreclosure action may be initiated during the trial period, and until the borrower has been considered and found ineligible for other available foreclosure prevention options. *See* Ex. 4 at Q63; *see also* Ex. 2 at p. 14.

- Requiring a borrower to make an initial contribution payment pending the processing of the trial period plan before the plan starts. Ex. 4 at Q. 83.

- Soliciting borrowers to opt out of consideration for HAMP during the temporary review period. Ex. 6 at Q1230-02.

- Reporting borrowers as delinquent to credit reporting bureaus without explanation. For borrowers who are current when they enter a trial period, the servicer should report the borrower current but on modified payment if the borrower makes timely payments during the trial period. For borrowers who are delinquent when they enter the trial period, the servicer should report in a manner that accurately reflects the borrower's current workout status. Ex. 2 at p. 22.

- Assessing prepayment penalties for full or partial prepayment made as part of the modification. Ex. 4 at Q. 25.

45.   The HAMP requires a participating servicer to send a Borrower Notice to every borrower who has been evaluated for HAMP but is not offered a Trial Period Plan, is not offered a modification officially designated as a HAMP modification, or is at risk of losing eligibility for HAMP due to failure to provide required financial documentation. Ex. 5 at p. 1.

46.   The HAMP presumes that permanent modifications will be extended and finalized upon successful completion of a TPP or shortly thereafter. HAMP Supplemental Documentation dated December 22, 2009 addresses situations in which the borrower has completed the TPP but has not yet received a permanent modification:

> In situations where an eligible borrower successfully completed the trial period and should have been converted to a permanent modification, but for reasons beyond their control were not timely evaluated for a permanent modification, the servicer must promptly make a determination as to whether the borrower is eligible for a permanent HAMP modification. If the borrower is eligible, then the servicer must offer the borrower a permanent HAMP modification as soon as possible, but in no event later than

sixty days after discovering the error.

Ex. 6 at Q1222-01.

47.     By entering into the SPA, Bank of America covenanted that all services would be performed in compliance with all applicable Federal, state and local laws, specifically including state laws designed to prevent unfair, discriminatory or predatory lending practices.  Ex. 1 at ¶ 5(b).

48.     Bank of America also covenanted that it would perform the services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care and degree of attention used in a well managed operation, and no less than what Bank of America exercises for itself under similar circumstances, and that Bank of America would use qualified individuals with suitable training, education, experience and skills to perform the services.  *Id*. at ¶ 5(d).

49.     Bank of America has routinely failed to meet its obligations under the SPA and the Program Directives.  Mortgage borrowers who request to be evaluated for a modification under HAMP routinely face unexplained delays and go weeks or months after providing the requested information with no communication from Bank of America.  Borrowers who attempt to contact Bank of America by telephone face long periods of time on hold and are transferred between service representatives in a deliberate effort to cause the borrower to give up and to terminate the call.  Bank of America regularly falsely informs borrowers that it did not receive requested information and demands that documents be re-sent.

50.     Bank of America has routinely failed to live up to its obligation under the TPP Agreements to offer permanent modifications to qualifying homeowners.  In January 2010, the U.S. Treasury reported that Bank of America had 1,066,025 HAMP-eligible loans in its portfolio.  Trial periods had been started on only 237,766 of these loans.  Of those, just 12,761 had resulted in permanent modifications (only 5% of the started trial modifications and just over 1% of the eligible pool) even though many more homeowners had made the payments and submitted the documentation required by the TPP Agreement.  The Treasury Report is attached

hereto as Exhibit 7.

51.     Former Bank of America employees have confirmed that Bank of America's non-compliance with HAMP can only be considered deliberate.  Bank of America's general practice and culture is to string homeowners along with no intention of providing permanent modifications.  Instead, Bank of America has put processes in place that are designed to foster delay, mislead homeowners and avoid modifying mortgage loans.

52.     A delay tactic a former employee described Bank of America commonly using is encouraging or even requiring homeowners to resubmit financial information each time the customer calls in to inquire about a pending modification.  Any change in financial information – even a small change - then causes Bank of America to restart the application process under the pretext of changed factual information.

53.     Bank of America customer service representatives are instructed to mislead homeowners who call to inquire about loan modifications for which they have applied. According to a former employee, customer service representatives regularly inform homeowners that modification documents sent by the borrower were not received on time or not received at all when, in fact, all documents have been received.  Similarly, homeowners are regularly told that documents were sent by Bank of America on a particular date, when in fact they had not been sent at all.

54.     A former Bank of America employee has confirmed that Bank of America regularly ignores completed loan modifications by not properly reflecting the modification in its computer system.  Bank of America continues to treat the loan as delinquent including by sending delinquency notices, reporting homeowners as delinquent to credit reporting agencies, and by instituting foreclosure proceedings.

55.     A former employee has confirmed that Bank of America regularly fails to properly credit payments homeowners make under a Trial Payment Plan.  Bank of America commonly applies payments to late fees or foreclosure fees and then deems a payment the homeowner made under a trial plan to be insufficient.  Bank of America's regular practice is to

place payments a homeowner makes into a suspense account or "partial payment balance account" and not to credit the homeowner's regular mortgage account. This results in Bank of America treating a homeowner who has made timely payments under a Trial Plan as delinquent.

56.     A former employee has confirmed that Bank of America does not employ the "waterfall" method mandated by HAMP. In addition, at least one former employee recalls seeing homeowners' financial records manipulated in Bank of America's computer system to the homeowners' detriment.

57.     Despite the HAMP directives regarding the specific manner in which homeowners in the process of applying for a modification or in a Trial Period Plan are to be reported to credit reporting agencies, a former employee has seen that Bank of America's practice is to report homeowners to credit reporting agencies as being delinquent without any further explanation, thereby further damaging the homeowners' credit.

58.     Former Bank of America employees attest to seeing records regarding hundreds of homeowners in Trial Plans but recall none who had a trial plan properly converted to a permanent modification following three or even four successful payments. According to the experience of these former employees, the vast majority of homeowners who seek a HAMP modification with Bank of America do not ever receive a permanently modified loan but are instead delayed indefinitely.

59.     By failing to live up to the TPP Agreement and convert TPPs into permanent modifications for qualifying homeowners, Bank of America is leaving homeowners in limbo, wondering if their home can be saved and preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward TPP payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

**D.    Plaintiff's Effort to Obtain a Loan Modification Under HAMP**

60.     James Langen and his wife Andrea Langen purchased their home in Northeast Portland in 2006, and reside there with their two young children.

61.     The home purchase was financed by a first mortgage that forms the basis of Mr.

Langen's claims in this case and a smaller second mortgage. The first mortgage was originated by American Brokers Conduit, Inc. and is currently being serviced by Defendant BAC Home Loans Servicing, LP. The mortgage loans are solely in Mr. Langen's name. The mortgage loans require payments currently of $2,661.43 per month, including tax and insurance reserves, for the first position mortgage and a variable amount usually around $270 per month for the second mortgage.

62.     The Langens are part owners of and are employed by a Northeast Portland restaurant. Mrs. Langen is also employed as a realtor with a Northeast Portland agency.   The Langens' household income declined sharply after the economic crash in 2008.

63.     After the drop in income, the Langens liquidated their savings and their Roth IRA, and took cash advances on their credit cards, in order to be able to continue to make their mortgage payments. By the spring of 2009, the Langens had exhausted their resources and started falling behind on the first mortgage. They continued to be able to make all payments on the second mortgage.

64.     The Langens called the HOPE hotline and consequently learned of the possibility of obtaining a HAMP modification of the first mortgage through Bank of America. The Langens then contacted Bank of America and received instructions as to the documents Mr. Langen was required to submit

65.     In June, 2009, the Langens faxed a hardship letter and financial documents to Bank of America including their most recent tax return, pay stubs, and bank statements. Between then and the end of August, they only received information about their modification application when they placed a telephone call to Bank of America. The Langens attempted to make a partial payment of their mortgage, but Bank of America rejected this payment.

66.     On August 26, 2009 a Bank of America representative threatened the Langens that Bank of America could commence foreclosure at any time, but that they could avoid a foreclosure by immediately paying $5,689 by Western Union. The Langens made the payment Bank of America demanded on August 27, 2009. Bank of America accepted this payment.

67.     On September 17, 2009, Mr. Langen received a letter from Bank of America informing him that his mortgage payment would be modified as part of HAMP and that he would be required to pay $2,031.12 per month during the three-month trial period with the first payment to be due on October 1, 2009. The letter went on to say that, "in the next few days," he would receive a package with additional details and documents.

68.     The package arrived on September 29, 2009. By that date, the Langens had made their first $2,031.12 trial modification payment. Bank of America received and accepted that payment.

69.     The package included a document entitled "Home Affordable Modification Trial Period Plan" ("TPP"). The letter accompanying the TPP stated "[i]nstead of making your existing mortgage payment, you will now make the new three-month trial period mortgage payment of $2,031.12." It then instructed Mr. Langen to provide certain documents. A copy of the TPP and letter that the Langens retained is attached as Ex. 9. Mr. Langen returned the signed and dated original of the TPP to Bank of America.

70.     The first paragraph of the TPP states:

> If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.
> Ex. 9.

71.     Mr. Langen executed the TPP and returned it to Bank of America along with all

other requested documentation on or about September 30, 2009. The Langens made each of the trial payments in full on or before the date required by the TPP. Bank of America accepted and cashed each payment. The Langens promptly complied with Bank of America's requests for additional documents and its other requests, including that they obtain credit counseling. The representations Mr. Langen made in Section 1 of the TPP have continued to be true in all material respects.

72.     Beginning in late December, 2009 and continuing through at least May, 2010, Bank of America's monthly statements included a document entitled "Important Message about your Home Affordable Modification Trial Period Plan." That document stated: "During this Trial Period, you may make your monthly payments at the Trial Period monthly payment amount." Beginning in February, 2010, the document specifically referred to the amount due as the $2,031.12 monthly payment stated in the TPP.

73.     Each month from January, 2010 through August, 2010, the Langens have made a monthly payment of at least $2,031.12 to Bank of America. Bank of America has accepted and cashed each payment but has not properly credited Mr. Langen's mortgage account.

74.     Though he has complied with all documentation and payment requirements of the Trial Period Plan, Bank of America has not provided Mr. Langen with a Modification Agreement that amends his loan. Bank of America has not permanently modified Mr. Langen's mortgage or note as promised under the terms of the TPP.

75.     The Langens have spent significant time and money in efforts to modify this loan including but not limited to postage and fax fees and many hours on the telephone. On repeated occasions, Mr. Langen has called Bank of America to inquire as to the status of the modification, often then authorizing Mrs. Langen to handle the call. They have regularly been transferred to

multiple departments with each call, have spent long periods of time on hold, and have received conflicting information.

76.     Despite making all TPP payments in full and on time for more than three months, Bank of America has continued to report Mr. Langen as delinquent to credit reporting agencies thereby damaging his credit.

77.     Like thousands of Oregon residents, the Langens have been living in limbo, without any assurances that their home will not be subject to foreclosure, despite compliance with HAMP requirements and continued monthly payments under the agreement dictated by Bank of America.  They have invested their limited resources in modified payments based on the promise that doing so would result in a permanent loan modification.

## E.     Class Allegations

78.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

79.     Plaintiff brings this action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and a Class consisting of:

> All Oregon homeowners whose loans have been serviced by one or both Defendants and who, since April 13, 2009, have requested and been otherwise eligible for a TPP under the terms of HAMP Program Documentation and whose loan Bank of America has not permanently modified either because Bank of America has not offered them a TPP, because they did not receive a permanent loan modification after they complied with their obligations under HAMP as conveyed to them by Bank of America, or because Bank of America has not honored the terms of a permanent modification agreement.

80.     Excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, Defendants' current or former officers, directors, agents, representatives, their family members, and the members of this Court and its staff.

81.     Based on the size of the modifications at issue, Plaintiff believes the amount in controversy exceeds $5 million.

**Numerosity**

82.     Plaintiff does not know the exact size of the proposed class or the identities of its members, since such information is in the exclusive control of Defendants.  Plaintiff believes that the Class encompasses thousands of individuals whose identities can be readily ascertained from Defendants' books and records.  Therefore, the proposed Class is so numerous that joinder of all members is impracticable.

**Common Questions of Law and Fact**

83.     All members of the Class have been subject to and affected by the same conduct. The claims are based on the terms of a single unifying contract between Bank of America and Fannie Mae, acting as agent for the United States Treasury, and on form contracts and uniform loan modification processing requirements.  There are questions of law and fact that are common to the class include, but are not limited to the following:

      a.     The nature, scope and operation of Bank of America's obligations to homeowners under HAMP;

      b.     Whether Bank of America breached its duties under HAMP that were intended for the benefit of class members;

      c.     Whether the manner in which Bank of America has executed the duties it undertook as part of the HAMP program violates its duty of good faith and fair dealing;

      d.     Whether Bank of America's receipt of an executed TPP Agreement, along with supporting documentation and three timely-made monthly payments, creates a binding contract or otherwise legally obligates Bank of America to offer Class members a permanent HAMP modification;

      e.     Whether Bank of America's failure to provide permanent HAMP modifications in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing;

      f.     Whether Bank of America demanded and collected initial payments from

eligible homeowners in violation of HAMP provisions;

g.      Whether Bank of America violated Oregon's Unlawful Trade Practices Act ("UTPA") by not disclosing its practice and policy of failing to provide a permanent modification when a homeowner successfully completes the trial program;

j.      Whether the above practices caused Class members to suffer injury; and

k.      The proper measure of damages and the appropriate injunctive relief.

**Typicality**

84.     The claim of the named Plaintiff is typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that both the Plaintiff and the other members of the Class were subject to the same conduct, were subject to the terms of the same agreement and failed to receive a permanent modification.

**Adequacy of Representation**

85.     The named Plaintiff will fairly and adequately represent the interests of the Class. He is committed to the vigorous prosecution of the Class's claims and has retained attorneys who are qualified to pursue this litigation and have experience in mortgage litigation and consumer class actions.

**(b)(2) Factors**

86.     Bank of America has acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

**(b)(3) Factors**

87.     A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.  The common questions alleged in paragraph 83 predominate over any questions affecting only individual members of the Class

## COUNT I

## BREACH OF CONTRACT / BREACH OF DUTY
## OF GOOD FAITH AND FAIR DEALING

88.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

89.     Plaintiff brings this claim on his own behalf and on behalf of each member of the Class described above.

90.     The SPA and the Program Documentation that it explicitly incorporates constitute a contract for which Plaintiff and the Class are intended beneficiaries, and under which Bank of America has undertaken duties to act for the benefit of Plaintiff and the Class.

91.     By entering into the SPA and accepting valuable consideration including $25 billion in funds from the U.S. Treasury, Bank of America covenanted, on behalf of itself and its subsidiaries, to perform its contractual obligations in accordance with principles of good faith and fair dealing.

92.     Bank of America has breached its contractual duties by failing to provide eligible borrowers with the opportunity to accept permanent loan modifications and by wrongfully collecting introductory payments.

93.     In addition to its duties to Plaintiff based on his status as a third party beneficiary under the SPA as a homeowner who has shown that he is eligible for a HAMP loan modification, Bank of America entered into an individual contract directly with Plaintiff.

94.     The TPP Bank of America sent to Plaintiff constitutes a valid offer.

95.     By executing the TPP and returning it to Bank of America along with the supporting documentation, Plaintiff accepted Bank of America's offer.

96.     Alternatively, Plaintiff's return of the TPP constitutes an offer.  Acceptance of this offer occurred when Bank of America accepted Plaintiff's TPP payments.

97.     Plaintiff's TPP payments to Bank of America constitute consideration.  By making those payments, Plaintiff gave up the ability to pursue other means of saving his home.

98.     Plaintiff and Bank of America thereby formed a valid contract.

99.     To the extent that the contract was subject to a condition subsequent providing Bank of America an opportunity to review the documentation submitted by Plaintiff when he returned the signed TPP, this condition was waived by Bank of America and/or it is estopped to assert it as a defense to Plaintiff's claims.

100.     By failing to offer Plaintiff a permanent HAMP modification, Bank of America breached this contract.

101.     Bank of America routinely and regularly breached its duties under both the SPA and its contracts with Plaintiff and other class members by failing to retain, employ, and supervise adequately trained staff; instituting and/or continuing with foreclosure proceedings against borrowers in a trial program; failing to provide written notices required by HAMP; deliberately acting to delay and otherwise frustrate loan modification processes; routinely demanding information already in its files; making inaccurate calculations and determinations of homeowners' eligibility for HAMP; demanding up front payments; and failing to follow through on written and implied promises.

102.     Plaintiff and other class members remain ready, willing and able to perform under the contracts by continuing to make TPP payments and provide documentation.

103.     Plaintiff and other class members have suffered harm and are threatened with additional harm from Bank of America's breach.  By making TPP payments both during and after the TPP, Plaintiff and other class members forewent other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home.  On information and belief, some putative Class members have suffered additional harm in the form of foreclosure activity against their homes.

## COUNT II

### PROMISSORY ESTOPPEL, IN THE ALTERNATIVE

104.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

105.     Plaintiff brings this claim on his own behalf and on behalf of each member of the

Class described above.

106.   Bank of America, in its TPP Agreements, promised Plaintiff and other class members they would receive a permanent HAMP modification if they returned the executed TPP Agreement with supporting documentation, and timely made their TPP payments.

107.   It was reasonably foreseeable to Bank of America that this promise would induce Plaintiff and other class members to rely on it and to comply with its terms.

108.   Plaintiff and other class members did indeed rely on Bank of America's promise, by submitting timely TPP payments and otherwise complying with the terms of the TPP.

109.   Given the language in the TPP Agreement, Plaintiff's and other class members' reliance was reasonable.

110.   Plaintiff's and other class members' reliance was to their detriment.  Plaintiff and other class members have yet to receive permanent HAMP modifications and have lost the opportunity to fund other strategies to deal with their default and avoid foreclosure.

**COUNT III**

**VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT.**

111.   Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

112.   Plaintiff brings this claim on his own behalf and on behalf of each member of the class described above.

113.   The Oregon Unlawful Trade Practices Act, O.R.S. 646.605 et seq., protects people who obtain real estate, goods or services, including loans and extensions of credit, primarily for personal, family or household purposes from fraudulent and unfair business practices.

114.   To be eligible for a HAMP modification, a loan must be on the borrower's principal residence.  Such loans are obtained and maintained primarily for personal, family or household purposes.

115.   After March 23, 2010, the monthly statements which Bank of America sent Plaintiff represented that he was "currently participating in a Home Affordable Modification

Trial Period Plan" pursuant to which he could make monthly payments of $2,031.12 and that he would be "notified once we have determined your eligibility for a permanent loan modification."

116.     In violation of ORS 646.608(e) and (k), Bank of America recklessly or knowingly failed to disclose its practice and policy of failing to provide a permanent modification when a homeowner successfully completes the trial program.

117.     Bank of America's conduct as set forth herein resulted in to Plaintiff and other class members losing money or property.  Pursuant to O.R.S. 646.638(1), Plaintiff and each Class member is entitled to recover actual damages resulting from the unlawful trade practices alleged in paragraph 116.

118.     Plaintiff and the class are entitled to their reasonable attorney fees pursuant to O.R.S. 646.638(3).

119.     Plaintiff demands a trial by jury on all issues so triable

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A.     Certify this case as a class action and appoint the named Plaintiff to be class representative and his counsel to be class counsel;

B.     Enter a judgment declaring the acts and practices of Bank of America complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that Bank of America is required by the doctrine of promissory estoppel to offer permanent modifications to class members;

C.     Grant a permanent or final injunction enjoining Bank of America's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiff and the members of the class;

D.     Order Bank of America to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

E.     Order specific performance of Bank of America's contractual obligations together with other relief required by contract and law;

F.      Reduce the amount of indebtedness of Plaintiff and each class member by the amounts Defendants have wrongfully claimed to be owed due to payment amounts, interest and fees that do not comply with HAMP or with contracts directly with Plaintiff or class members;

G.      Award restitution as well as actual damages to the Plaintiff and the class in amounts to be proven at trial;

H.      Award Plaintiff the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

I.      Grant Plaintiff and the class such other and further relief as this Court finds necessary and proper.

DATED this _8th_ day of September, 2010.

_____
Phil Goldsmith, OSB No. 78223
Nanina Takla, OSB No. 09525
LAW OFFICE OF PHIL GOLDSMITH
1618 SW First Avenue, Suite 350
Portland, OR 97201
Telephone: (503) 224-2301
Facsimile:  (503) 222-7288

STEVE W. BERMAN
ARI Y. BROWN
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
(206) 623-7292
steve@hbsslaw.com
ari@hbsslaw.com
(to be admitted pro haec vice)

Attorneys for Plaintiffs